IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 07-332 |
| | ) | |
| MAX RAY BUTLER, | ) | |
| a/k/a MAX RAY VISION | ) | |

GOVERNMENT'S SENTENCING MEMORANDUM

AND NOW comes the United States of America, by its attorneys, Robert S. Cessar, Acting United States Attorney for the Western District of Pennsylvania, and Luke E. Dembosky, Assistant United States Attorney for said District, and respectfully submits this memorandum in aid of sentencing:

I.   Factual and Procedural Background

The defendant, Max Ray Butler, a/k/a Max Vision (hereinafter "Mr. Butler"), was arrested on September 5, 2007 on a criminal complaint in San Francisco, California by agents of the United States Secret Service. A corresponding search of the defendant's computer systems revealed that he possessed more than 1.8 million stolen credit card numbers[1], and had hacked into thousands of computers to get them.

On September 11, 2007, a grand jury in the Western District of Pennsylvania returned a five-count indictment against the defendant, charging him with three counts of wire fraud, in

---

[1] The exact figure is 1,834,244 card numbers. Of these, 1,166,851 were Visa cards, 453,154 were Mastercard, 164,877 were American Express, and 49,362 were Discover.

violation of Title 18, United States Code, Section 1343, and two counts of identity theft, in violation of Title 18, United States Code, Section 1028(a)(7).

The indictment alleges, in summary, that the defendant engaged in a scheme to hack into computer systems to steal and sell credit card information on a massive scale. The defendant accomplished the sale of the card numbers primarily in two ways. First, the defendant simply sold the card numbers that he stole over the Internet to buyers around the world, often in connection with an Internet forum known as "Cardersmarket," created and operated by the defendant. This forum was dedicated to "carding" activities, as detailed in the Indictment, and had thousands of members worldwide. Second, the defendant maintained a regular business relationship with accomplices in Southern California, to whom the defendant provided a regular stream of stolen card numbers in exchange for payments out of the proceeds of their illicit purchase and sale of merchandise obtained with the card numbers.

On June 29, 2009, the defendant pled guilty to Counts One and Two of the Indictment (each charging wire fraud), but acknowledged his responsibility for the remaining counts of the Indictment and the Court's ability to consider them against him at sentencing. The parties stipulated to a loss for purposes of the Sentencing Guidelines of $86.4 million, representing the total of the fraudulent charges on the credit card accounts possessed by the

defendant, as reported by VISA, Mastercard, American Express and Discover as of the time the parties began discussing a plea.[2] The losses on the cards in Mr. Butler's possession were borne by the thousands of financial institutions that issued them.

Although the defendant acknowledges that he is responsible for $86.4 million in fraudulent charges for purposes of sentencing loss, he contends that he should not be required to pay restitution for these losses because it cannot be proven that he caused them, or because restitution is otherwise too difficult to calculate. Although the government intends to address the subject of restitution through the presentation of evidence and argument at the hearing, the government submits this memorandum for the purpose of providing the Court with a preview of the legal and factual issues involved in this determination.

## II. Applicable Law

Title 18, United States Code, Sections 3663 and 3663A address orders of restitution. Section 3663(a)(1)(A) provides, in general, that a court "may" order restitution to "any victim" of the offense. Section 3663A concerns mandatory restitution, and provides in relevant part that a court shall require the defendant to pay restitution for any offense "in which an identifiable victim

---

[2] This number, while not a perfect or otherwise final loss figure, represented the fraudulent charges on the cards known at the time, and a substantial reduction from the $500 per card called for by the Sentencing Guidelines as a sentencing loss figure.

or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1)(B). For purposes of both statutes, a "victim" is defined as follows:

> [T]he term "victim" means a person directly or proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern....

18 U.S.C. §§ 3663(a)(2) and 3663A(2).

Likewise, both sections make clear that restitution is not tied to the amount of gain obtained by the defendant, but rather centers on the value of the damage or loss caused to the victims. See 18 U.S.C. §§ 3663(a)(b) and 3663A(b).

As is relevant to the discussion below, Section 3663(b)(6) further provides that the court may require that the defendant, "[i]n the case of any offense under sections 1028(a)(7) or 1028A(a) of this title, pay an amount equal to the value of the time reasonably spent by the victim in an attempt to remediate the intended or actual harm incurred by the victim from the offense."

In contending that he should not be required to pay restitution in this case, the defendant relies, in his objection to the Presentence Investigation Report, on Subsection 3663A(c)(1)(3)(B), which provides as follows:

> This section shall not apply in the case of an offense described in paragraph (1)(A)(ii) in the court finds, from facts on the record, that–

4

> (B) determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process.

For the reasons set forth below, the government believes that the defendant should be ordered to pay restitution equal to the fraudulent charges on the cards beginning as of June 2005 when the Indictment alleges that the scheme began.

### III. Argument

There are essentially no material facts in dispute. The defendant's scheme involved stealing and selling credit card account numbers. The scheme affected thousands of financial institutions and other businesses and likely more than a million individuals. Granted, what the defendant did to obtain the card numbers was often highly sophisticated. Yet the government submits that, in the end, much of the damage caused by the defendant can be reduced to numbers.

A.   Proximate Cause

The real issue before the Court regarding sentencing is one of proximate cause. The parties disagree on whether the defendant can be held responsible for restitution for the fraudulent charges on the cards occurring during or after the scheme. The defendant pled guilty to a scheme in which he was in business, for a period of years, of stealing and selling card numbers. The government believes that the defendant's actions are therefore a proximate

cause of the resulting fraudulent charges on the cards, as he was in the business of selling, on a major scale, the account numbers he obtained through hacking. Quite simply, the defendant makes the losses possible by hacking into business and personal computers to obtain the card numbers, and then by selling the numbers to others, who engage in fraudulent transactions with the card numbers.

At the change of plea hearing, the defendant's counsel attempted to counter these facts by asserting that the defendant hacked other hackers, and so was often not the hacker in the first instance; similarly, the defense has asserted that, even where Mr. Butler was the original hacker, it is possible that others also obtained the account numbers independently through hacking activity. The government is not aware of another reported decision that has addressed this issue of causation in the context of computer hacking. See United States v. Little, 308 Fed. Appx. 633 (3d Cir. 2009) (upholding restitution order as to all losses incurred on cards stolen by the defendant and passed on to others; the defendant's acquisition of the cards did not involve computer hacking).

In response to the defendant's arguments, the government notes first that it was a very rare instance in which the defendant acquired card numbers other than through his own hacking activity. In fact, as to at least 1.1 million of the card numbers, the government will show definitively through forensic analysis that

the defendant was the original hacker. Given what the forensic examiners have observed of Mr. Butler's hacking activities and business practices, it is highly likely that the vast majority of the remaining account numbers in his possession were also obtained by him in the first instance.[3] Moreover, even if the defendant were not the original hacker as to some of the accounts, the evidence indicates that he obtained the card numbers to sell them, and the act of selling them is also sufficient to be a proximate cause of the losses.

Finally, the government does not believe it is required to eliminate all theoretical possibilities concerning other computer hackers. The defendant's own act of hacking the account numbers puts the card numbers on the market, and foreseeably results in fraudulent charges. While it is conceivable that someone else acquired some of the card numbers through their own hacking activity, the government believes that the defendant should not be permitted to avoid restitution by hiding behind theories that have no factual basis, in the face of evidence of his own activity

---

[3] In one instance, the defendant obtained 72,320 card numbers by hacking a fraud investigator who obtained them from financial institutions reporting that the accounts had been compromised. The forensic evidence, however, indicates that these cards had been compromised prior to March of 2004, and so charges on these cards would not be counted in a restitution calculation after the June 2005 start date of the scheme alleged in the Indictment

related to these accounts.[4]  The evidence before the Court at the sentencing will point to the defendant as a proximate cause of the charges on the cards, as the one who obtained the cards through computer intrusions and who was in the business of selling them on a major scale.  Under these circumstances, the government believes that a restitution award in this case would make clear that theft that occurs by means of the Internet does not automatically preclude a restitution award based on groundless assertions that others might have stolen the same thing.

B.   Calculation of Losses

If the Court agrees that the defendant is the proximate cause of the fraudulent charges on the accounts, the final step is the issue of calculation in this case.  If the Court were to further accept the methodology proposed by the government based on 1.8 million cards and beginning with fraudulent charges in June 2005, the government requests that the Court set a hearing at a later date to receive the specific loss amounts incurred by the banks using this methodology.  The government's existing loss numbers on the cards include some losses that, while important for relevant conduct, pre-date the alleged start date of the scheme.  With a ruling on this issue, the government will ask Visa, Mastercard,

---

[4]   It is also conceivable that some of the individuals reporting the fraudulent charges on their cards were making false claims, but in no reported case has the government been required to disprove all such possibilities.

American Express and Discover to produce final loss numbers based on the approved methodology.  The government would then present these final figures to the Court.  The government does not, however, believe that a delay in the overall sentencing hearing is necessary solely to finalize the restitution award.

C.   Other Losses Involved in the Case

The reasonableness of the government's position as to restitution is highlighted by all of the losses caused by the defendant that are not counted in the fraudulent charges on the stolen accounts. Because of the enormous losses on the credit cards, the government does not intend to request restitution for these additional damages, but merely seeks to bring them to Court's attention so that the Court has a more complete picture of the harm caused by this activity.

For example, there are the out-of-pocket costs incurred by the issuing banks when a credit card number is stolen.  The government will present evidence that, accounting for time expended, reproduction costs, and postage, this amounts to between $25 and $75 per card number. Even in the best case for the defendant, that is $45 million ($25 per card multiplied by 1.8 million cards).

Moreover, as noted above, where the offense involves a Section 1028(a)(7) violation, as it does here, the Court may order restitution for the reasonable value of the time expended not only by the issuing banks, but also by the individual card holders whose

9

accounts were compromised. This is the case under the non-mandatory restitution provision set forth in 18 U.S.C. § 3663(b)(6), quoted above. Therefore, even if the Court were to assign a relatively small value, such as $50, to the time spent by each card holder attempting to deal with the bank, credit bureaus and/or police to remediate the theft of their card number, the figure is astronomical over 1.8 million cards.

Finally, there is another elephant in the room. What is also not counted in the government's proposed restitution figure (largely because it *is* so difficult to calculate), is the value of the time and resources expended by the hundreds, if not thousands, of intrusion victims. The government is prepared to present forensic testimony at the sentencing hearing as to number of businesses involved, and the scope of Mr. Butler's hacking activity against these businesses. In many instances, the evidence shows that the defendant had so embedded himself in the systems of major institutions that it would take a monumental effort (and corresponding expenditure of resources) eradicate him and restore the integrity of the systems.

The government notes the above losses to demonstrate further the reasonableness of its position as to the proposed restitution methodology.

                                      Respectfully submitted,

                                      ROBERT S. CESSAR
                                      Acting United States Attorney

                                      <u>/s/ Luke E. Dembosky</u>
                        By:  LUKE E. DEMBOSKY
                                      Assistant U.S. Attorney
                                      U.S. Post Office and Courthouse
                                      700 Grant Street
                                      Suite 4000
                                      Pittsburgh, PA 15219
                                      412/894-7350
                                      412/894-7311 (Fax)
                                      Luke.Dembosky@usdoj.gov
                                      PA ID No. 75596